IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ANGEL BARBER, <br><br> Plaintiff, <br><br> v. <br><br> GARY BARNABY, <br><br> Defendants. | CIVIL ACTION FILE NO.: <br> 1:18-CV-04925-AT |

## MOTION TO RECONSIDER EXCLUSION OF EXPERT WITNESS LAMAR BLOUNT

COMES NOW GARY BARNABY and hereby moves that this Court reconsider its decision to exclude Defendant's medical billing expert Lamar Blount. The parties discussed the anticipated testimony of Mr. Blount in the hearing of May 10, 2019, resulting in the Minute Sheet Entry at Doc. No. 48 (although said document does not reference Mr. Blount). Defendant's understanding was that this Court excluded Mr. Blount from testifying on the basis of relevance along with this Court's concern that his testimony would unnecessarily enlarge the proceedings at a late stage (with the original discovery deadline then pending on May 24, 2019). However, this Court extended the discovery deadline for expert witness proceedings through August 2, 2019, providing sufficient time to involve Mr. Blount in this case.

Defendant asks this Court to reconsider the exclusion of Mr. Blount based on new 11th Circuit case law, as well as the recent testimony of Dr. Erik Bendiks.

## SUMMARY OF ARGUMENT

Lamar Blount's testimony would be pertinent to important questions of the reasonableness and necessity of Plaintiff's medical bills, particularly those issued by Georgia Spine & Orthopedics / Dr. Bendiks. On April 29, 2019, the 11th Circuit issued its opinion in *Showan v. Pressdee*, 922 F.3d 1211, 1218 (11th Cir. 2019), specifically authorizing this very same witness (Lamar Blount) to provide the type of testimony Defendant anticipates him providing in the instant case.[1] Furthermore, Dr. Bendiks was deposed on May 17, 2019, <u>admitting</u> on the record that his bills contain the very type of fraudulent billing practices Mr. Blount would analyze and explain to the jury. *Supra.*

## ARGUMENT AND CITATION OF AUTHORITY

1. <u>*Showan v. Pressdee* Specifically Authorizes this Same Expert to Provide the Same Anticipated Testimony</u>.

Defendant will first address the question of the relevance of Lamar Blount's testimony. In *Showan*, the 11th Circuit characterized Lamar Blount as a "medical rate

---

[1] The *Showan* case had not yet been published as of the hearing of May 10, 2019, and Defense counsel was unaware of it at that time.

expert." *Showan*, 922 F.3d at 1217. Mr. Blount, along with a second billing expert, "relied on average rates that included those subsidized by the government or private insurers." *Id.*

In *Showan*, the treating physician charged $173,213 for a discectomy[2] surgery and another $80,768 for a "facility fee." *Id.* "Blount testified that, based on databases for doctors in the same area, the 90th percentile charge for the same procedure would be $20,688. The 80th percentile for a facility fee would be $27,144." *Id.*

The same circumstances exist here: according to Plaintiff's demand correspondence, Georgia Spine & Orthopedics has charged $174,975.00 for procedures including a discectomy/cervical disk replacement, along with another $52,392.79 in "facility fee" charges.[3] Defendant anticipates that Mr. Blount would offer testimony comparing those charges with the 50th and 75th percentile rates for similarly-situated doctors performing similar or identical procedures within the Metro Atlanta market area, thus demonstrating that the market rate for such

---

[2] The Mayo Clinic defines a discectomy as "a surgical procedure to remove the damaged portion of a herniated disk in your spine." *See* https://www.mayoclinic.org/tests-procedures/diskectomy/about/pac-20393837.

[3] A cervical disk replacement surgery involves the removal of a natural vertebral disk and replacement of same with metal and plastic hardware. ("Discovery Deposition of Erik Bendiks taken May 17, 2019", filed separately and hereinafter "Depo. Bendiks," at P63, L9—P64, L7). Defendant understands that these charges have increased since the date of the demand as Plaintiff has continued to treat.

procedures is <u>substantially</u> lower than the rate charged by Dr. Bendiks's practice.

In *Showan,* the 11th Circuit noted that Mr. Blount's "testimony addressed the reasonableness and necessity of what Showan had paid for her discectomy. Whether the expenses were 'reasonable and necessary' **is a critical inquiry** under Georgia law." *Showan*, 922 F.3d at 1218 (emphasis supplied). The 11th Circuit also noted that the experts' testimony did not violate the Collateral Source Rule (as plaintiff in that case argued), reasoning:

> **Defendants were properly allowed to argue that medical charges were unreasonably high**. They did not try to get any "credit" from the jury based on payments that Showan had received. [] Indeed, Showan, who is uninsured, says she received no such payments. Showan's argument thus fundamentally misinterprets the collateral source rule. She contends that the district court should have excluded evidence not of what was paid but of what might have been paid had she obtained insurance. Defendants were not trying to introduce such evidence.

*Id.* at 1218 (emphasis supplied).

Finally, and importantly for purposes of the current posture of this case, the 11th Circuit also opined that Rule 403 was not violated:

> Showan's Rule 403 argument also fails. As noted above, Georgia law permits testimony regarding whether medical expenses are reasonable and necessary. And to the extent Showan suggests that the testimony of Blount and Schmor was misleading, she could have offered her own expert testimony to disagree with or supplement their testimony. If Showan believed the "volume discounts," as she describes them, did not apply to her, she could have attempted to convince the jury of that. **But the district court did not err in allowing Defendants' experts to**

**give the jury a picture of what most doctors in the area charge for a discectomy.**

*Id.*

Defendant attaches hereto the Rule 26(b) summary report of Lamar Blount as Exhibit "A", along with Mr. Blount's "Detailed Findings" further explicating same as Exhibit "B". This proffer fully discloses Mr. Blount's opinions and the basis of his testimony, which is sophisticated, reliable, and has been approved by many courts, now including the 11th Circuit. *Id; see also Med. Ctr., Inc. v. Bowden*, 348 Ga. App. 165, 171, 820 S.E.2d 289, 300 (2018) ("Blount testified that there is a standard method among hospitals for calculating the reasonable amount of billed charges, and, according to his research, TMC charged rates that were higher than comparable hospitals.[] We conclude that Blount's opinion was both reliable and relevant").

Defendant intends to offer Lamar Blount's testimony on the same basis in this case as in *Showan*: he will opine as to the reasonableness and necessity of the medical bills charged to Plaintiff, most notably by Dr. Bendiks, providing the jury with comparative information so they have "a picture of what most doctors in the area charge" for the procedures Plaintiff has received. *Showan*, 922 F.3d at 1218.

2. <u>Dr. Bendiks has Also Admitted that His Bill Contains Known Examples of Billing Fraud</u>

Lamar Blount is a medical coding and billing expert. He is qualified to testify both as to comparative market rates for a given procedure, as approved by the 11th Circuit in *Showan*, and also to explain to the jury certain known instances of accounting or billing fraud if a provider happens to be employing those disreputable tactics in its bill. Dr. Bendiks has already admitted that examples of such accounting "errors" exist in his bill, although he characterizes these as unintentional, discussed in detail *supra.* "Errors" in a physician's bill (such as Dr. Bendiks's) go to the "necessity" side of the "reasonable and necessary medical bills" analysis, as referenced by the 11th Circuit in *Showan*. If a bill contains "errors" or outright fraud, such charges were not necessary and are therefore within the expert's purview. Such "errors" also go to the expert's overall credibility, and potentially reveal bias, intent or motive (particularly when those "errors" are coupled with direct referral relationships with medical funding companies, as is the case here[4]). *See, e.g. ML Healthcare Servs., LLC v. Publix Super Markets, Inc.*, 881 F.3d 1293, 1306 (11th Cir. 2018).

---

[4] Defendant has separately filed a motion for sanctions based upon Georgia Spine & Orthopedics' misleading and abusive discovery tactics, which served to conceal their referral partnership with Omni Funding Company from Defendant and this Court. The doctor-funder referral partnership was only revealed at Dr. Bendiks's deposition when he belatedly produced voluminous notes pertaining to Plaintiff's treatment and the funding arrangement directly facilitated by his staff.

In the medical billing and coding industry, certain accounting practices are recognized as fraudulent. These include "up-coding," "un-bundling," "double billing" and billing for procedures that were not actually performed. According to the National Correct Coding Initiative Policy Manual for Medicare Services[5], "un-bundling occurs when multiple procedure codes are billed for a group of procedures that are covered by a single comprehensive code." Dr. Bendiks agreed with this definition at his deposition. (Depo. Bendiks at P42, LL9-13). The CMS manual continues: "Two types of practices lead to un-bundling. The first is unintentional and results from a misunderstanding of coding. The second is intentional and is used by providers to **manipulate coding in order to maximize payment**." Dr. Bendiks was read this definition at his deposition, and he agreed that "un-bundling would be a kind of billing fraud" "if it was intentional." (Depo. Bendiks at P42, L22—P43, L1).

Dr. Bendiks's bill for both of the surgical procedures he performed contained a <u>separate</u> billing entry for "fluoroscope exam[s]". (Depo. Bendiks, Defendant's Ex. "1", at Bates-stamp EB0004). A fluoroscope is a device that allows a doctor to see, using x-rays, into the patient's body while he or she performs surgery on the patient.

---

[5] The Centers for Medicare & Medicaid Services administer the federal government's Medicare/Medicaid program. "CMS" maintains a "National Correct Coding Initiative Program" which seeks to identify and control billing fraud in the medical industry. *See, e.g.,* "National Correct Coding Initiative Edits" webpage at https://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd.

For the lumbar surgery he performed on Plaintiff, Dr. Bendiks billed $1,300.00 for the fluoroscope use, <u>separate</u> from his surgical bill of $22,650.00. For the cervical surgery he performed, Dr. Bendiks billed $2,300.00 for fluoroscope use, again <u>separate</u> from his total surgical bill of $32,000 (billed as $22,000 for one level and $10,000 for the second level).

Billing separately for a "fluoroscope exam" while simultaneously performing surgery is a <u>classic example</u> of un-bundling, used by a provider to "manipulate coding in order to maximize payment." *Infra*. When challenged on these bills (*see* Depo. Bendiks at PP36-41), Dr. Bendiks admitted on the record that these charges were inappropriate and should have been rolled into the surgical costs:

```
 3     Q   Do you go back and review the bills that are
 4   issued to your patients before they go out to confirm
 5   that the codes are all entered properly and they've
 6   all -- everything's been billed prop- --
 7   appropriately?
 8     A   No, no.  The only thing I know now is that
 9   the fluoroscopy codes are now included.  They've
10   been -- there's a CC edit that came out so now they're
11   included.
12     Q   So you think that the change -- there's been
13   a change, am I understanding that, to where the
14   fluoro- -- fluoroscopy codes are included with the
15   procedure?
16     A   Yes.
17     Q   When was that change made?
18     A   That I don't know.  I made -- I became aware
19   of it this past year or maybe last year.  I'm not sure
20   exactly when.
```

21    Q   So, in other words, those fluoroscopy codes
22 really should be rolled into or bundled with the
23 procedure codes?
24    A   Yes.

[]

2    Q   (By Mr. Matthews) Okay.  Would you agree
3 that if your bill reflects any type of unbundling,
4 that would be a mistake, and it would need to be
5 corrected?
6        MR. GARDNER:  Object to form.
7    A   **Which is, I believe, what I just told you.**
8 **Now I know that.**
9    Q   Right.
10   A   **I've been made aware of that.**
11   Q   So, for example, **the fluoroscopy code that's**
12 **entered separately is a mistake**, it needs to be
13 corrected?
14   A   **Correct**.
15   Q   You do not intentionally overbill patients,
16 agreed?
17   A   No.

[]

17   Q   Okay.  Have you personally reviewed your
18 bills at any time to determine whether there are any
19 examples of unbundling, upcoding, double billing, or
20 billing for procedures that were not performed?
21       MR. GRANT:  Object to form.
22   A   No.  Other than just now looking at the
23 fluoroscopy code.
24   Q   (By Mr. Matthews) Okay.  **So that was one**
25 **example we were able to find in a relatively short**
1 **time; agreed**?
2    A   **Yes.  I see that example**.

(Depo. Bendiks at P41, LL3-24; P43, LL2-17; P45, L17—P56, L2)(emphasis supplied).

Dr. Bendiks admitted that he does not review his bills to confirm that charges are issued to patients appropriately. He further admitted that this particular Plaintiff's bills contained two clear examples of unbundling—a known type of billing fraud—because he charged his patient $3,600.00 extra for fluoroscopy procedures which should have been rolled into or bundled with the $54,650.00 he was already charging the patient for the two surgeries he performed. He characterized this over-billing example as a mistake.

Dr. Bendiks similarly agreed with the definition of "upcoding" provided by the McGraw Hill Concise Dictionary, as follows: "A fraudulent practice in which a provider's services are billed for higher CPT procedure codes than were actually performed, resulting in a higher payment by Medicare or third-party payers." (Depo. Bendiks at P43, L23—P44, L6). He agreed such a practice would be another type of billing fraud "if it was done intentionally." (Depo. Bendiks at P44, L7-14). He agreed that if his bill were to contain examples of upcoding that would be a mistake that would need to be corrected, because he does not intentionally overbill patients. (Depo. Bendiks at P44, LL15-19).

Dr. Bendiks also agreed that "double-billing" means billing two times for one

procedure instead of merely one time. (Depo. Bendiks at P44, L25 – P45, L4). He agreed that it would be inappropriate to bill for a procedure that was not performed. (Depo. Bendiks at P45, LL5-8). He agreed that if his bill contained any instances of double-billing or billing for procedures that were not performed, that would be a mistake that would need to be corrected. (Depo. Bendiks at P45, LL9-14). He admitted that he has not personally reviewed his bills at any time to determine whether there are any examples of unbundling, upcoding, double-billing, or billing for procedures that were not performed. (Depo. Bendiks at P45, LL17-21). However, he agreed that in the medical world, everything a doctor does should be coded and coded properly, stating: "[I]f you do something, then you should code for it." (Depo. Bendiks at P40, LL22-23).

Dr. Bendiks employs a unique business model which is fundamentally different from that of the average physician. When asked if his business model as a practice group was "based on litigation," he stated that he is an orthopedic surgeon who primarily sees work-related or accident-related injuries, "**but, yes**" his practice is based on litigation. (Depo. Bendiks at P52, L19—P53, L12). In furtherance of this business model, Dr. Bendiks is "not in network for any medical insurance provider." (Depo. Bendiks at P48, L23-P49, L1). Moreover, he is not in network and does not accept payment from Medicare or Medicaid. (Depo. Bendiks at P49, LL2-4).

Instead, he estimates that 30% of his patients are involved in "car accidents, assaults, [or] slip and falls," and he says this part of his practice is growing. (Depo. Bendiks at P54, LL4-9). He derives another 40% of his business from patients with worker's compensation claims. (Depo. Bendiks at P54, LL10-14). The remaining 30% of his patients "may be out-of-network if they have out-of-network benefits," but (as Dr. Bendiks puts it) "there has to be another method of payment." (Depo. Bendiks at P55, LL3-7). As he also explains, "I just take patients that will pay me at time of service or promise to pay me at a later date, but I don't take any health insurance." (Depo. Bendiks at P49, LL7-9). When he references the "promise to pay at a later date," he means "on a lien". (Depo. Bendiks at P49, LL10-14). In sum, Dr. Bendiks derives 70% or more of his business from patients with active litigation, either in the third party world (as here) or in the worker's compensation world. His practice, as he admits, is <u>based on litigation</u>.

  Specifically, Mr. Blount has identified $14,778.69 in bills issued by Dr. Bendiks for services that either were not properly documented or were "unbundled" in a classic example of billing fraud. Ex. A. Mr. Blount has additionally identified $54,488.35 worth of bills that were issued at rates exceeding the 75th percentile of the Atlanta market, plus another $5,663.04 of prescription drug bills that exceed reasonable and customary charges. All told, Dr. Bendiks's billing irregularities and

over-charges amount to $74,930.08 in <u>over-charged</u> or <u>un-bundled</u> (fraudulent) bills.

Notably, the figure of $74,930.08 in over-chares gives Dr. Bendiks credit for being in the top 25% of doctors in the Atlanta market, by comparing his rate with the 75th percentile of charges for similar procedures by similar doctors in our city. If one instead compares the bills to the market average, i.e. the 50th percentile for billing, then Dr. Bendiks's bill is inflated by $86,085.66, representing an **over-billing rate of 322%** of actual market averages.

Defendant should be allowed to put up evidence showing that Dr. Bendiks's litigation-focused practice has resulted in a number of billing irregularities, including both over-charging (based on comparable rates charged by other physicians for the same work) and outright billing fraud, which Dr. Bendiks characterizes as mistakes or unintentional oversights. In addition to the 11th Circuit's recent decision in *Showan*, confirming that Mr. Blount's testimony is acceptable and will not unreasonably enlarge these proceedings, Dr. Bendiks's <u>own admissions</u> during his deposition also fundamentally changed the picture of how his bills can be fairly presented to the jury. Dr. Bendiks's personal credibility in claiming his billing errors were a "mistake" is called into question by the voluminous number of over-charges Mr. Blount has identified, representing a 322% inflation rate. Defendant has a *bona fide* need **to rebut Dr. Bendiks's testimony** with Mr. Blount's evidence.

Coupled with the simultaneous revelation at Dr. Bendiks's deposition that <u>his own staff</u> referred plaintiff to Omni Funding Company in order to secure partial pre-payment for the procedures he rendered, Dr. Bendiks's bias, intent, and motive is also in question here. His billing practices go to that question.

Mr. Blount has advised that he is generally available to be deposed during the remaining Discovery period **except** on the following dates: June 4, 5, 6, 7, and 31; July 22 and July 31. Likewise, Defense counsel is generally available to accomplish the deposition of Mr. Blount during the remaining Discovery period.

## **CONCLUSION**

Based on the case law guidance, Mr. Blount's recent approval by the 11th Circuit (as well as Georgia's Court of Appeals) in cases in which he offered practically identical testimony, <u>and</u> based upon Dr. Bendiks's own admissions of record as to his billing practices and litigation-focused business model, Defendant respectfully requests that this Court reconsider its ruling excluding Mr. Blount from testifying in this case.

SO MOVED this 3rd day of June, 2019.

                                      McMICKLE, KUREY & BRANCH, LLP

                              By:   */s/ Zach M. Matthews*
                                          ZACH M. MATTHEWS
                                          Georgia Bar No.: 211231
                                          *Attorney for Defendant Barnaby*

217 Roswell Street, Suite 200
Alpharetta, Georgia 30009
Telephone:  (678) 824-7800
Facsimile:   (678) 824-7801
Email:        zmatthews@mkblawfirm.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ANGEL BARBER, <br><br> Plaintiff, <br><br> v. <br><br> GARY BARNABY, <br><br> Defendants. | CIVIL ACTION FILE NO.: <br> 1:18-CV-04925-AT |

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing **MOTION TO RECONSIDER EXCLUSION OF LAMAR BLOUNT** to be filed electronically with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following attorneys of record:

Timothy J. Gardner
Henrietta G. Brown
Gardner Trial Attorneys, LLC
3100 Cumberland Blvd., Suite 1470
Atlanta, GA 30339
*Attorneys for Plaintiff*

Thomas C. Grant
Gary Freed
Desmond Dennis
Freed Howard, LLC

Adam Joffe
Goodman, McGuffey, LLP
3340 Peachtree Road, NE, Suite 2100
Atlanta, GA 30326-1084
*Attorney for American Family Insurance Company*

M0503567.1 14256

16

101 Marietta Street, NW, Suite 3600
Atlanta, Georgia 30303
***Attorneys for Non-Parties Erik Thor Bendiks, M.D., and Georgia Spine & Orthopaedics, LLC***

This 3rd day of June, 2019.

                                MCMICKLE, KUREY & BRANCH, LLP

                                BY:   */s/ Zach M. Matthews*
                                        ZACH M. MATTHEWS
                                        Georgia Bar No. 211231
                                        *Attorney for Defendant*

217 Roswell Street, Suite 200
Alpharetta, GA 30009
Telephone:  (678) 824-7800
Facsimile:   (678) 824-7801